I'm told that the parties are here in all cases, or counsel for the parties, I should say, so we'll start right away. Standard Security Life Insurance v. Berard. Good afternoon, Your Honors. May it please the Court, Conrad Jordan for Appellant Cross Appellee, Brian Berard. On reasonable reliance, I'd like to summarize four points before addressing the statute of limitation and release issues. And just as a preface, the fraud alleged here is sending the release form which falsely convinced Berard he already had a repayment obligation in the event of comeback regarding his private policy as he did in his CBA policies. The four points are, number one, the lower court erroneously applied a reasonable reliance standard that ignored the notice component that this court applied to reverse summary judgment for Hyassong and Keywell corporations who were sophisticated parties faced with some hints of fraud. Unlike Berard, who is an unsophisticated litigant with zero notice that his insurer was rewriting his policy with the release form. Number two- Do you agree he had the actual policy at the time he signed the documents that are at issue? He had access to the policy. What the lower court ignored is whether he had any reason to think he should run and look at that policy because his insurer sent him a form that didn't match his- I'm trying to make sure I understood the fact. Yes. When you say he had access to the policy, he had a copy of the policy. He had a copy of the policy. And it was written in plain English. It was about ten pages long, right? That's all correct. That's all correct. But my next point, number two, the lower court issued a conclusory ruling regarding whether this gave him the means to discover that he's being defrauded. The lower court doesn't cite a single provision of the policy as to how it is supposed to tell Brian Berard that he's being defrauded. When he entered into the repayment agreement- Yes. He had an agent. He had counsel. He had an agent, which he had had all along, who was not involved in the claims process. He had an attorney who submitted a declaration saying, my starting point was these release forms that I already saw signed that said he had to repay. And we were worried what happens if he goes out and he falls on his face on day one and he has to repay $6 million, etc. So I was hired to negotiate how to repay. I never got involved in whether there was any obligation to start with that he should repay. And let me point out- Before he entered into the repayment agreement, I mean, presumably someone would have looked at the policy to see what was involved. No. Your Honor raises a question of fact because the record says, Mr. Riley, the attorney specifically says, I never got involved in those releases. I never looked at whether he's supposed to repay. You have to recall that one of the things that made this subtle and effective fraud so successful is there is a repayment obligation in the other policies, in the CBA policies. So some hockey players are forced to repay, and Mr. Barard would have with the other policies. So this attorney comes on, his sole job is to negotiate, well, what happens if he makes a comeback and it doesn't go anywhere. You would think that the starting point for that was to understand the nature of the coverage that was there to begin with. And yes, there was a repayment obligation undertaken thereafter. But to understand how the policy worked and what his leverage was, I find it very difficult to believe that it wouldn't have been ordinary care to look at the underlying policy when negotiating just months later, just months later, the repayment terms. Your Honor, I'm afraid that raises questions of fact. But, you know, you can't say, I believe as a matter of law, that you're now imputing to Barard that his attorney should have looked behind something that nobody had any reason to suspect. He doesn't have to look at the coverage. Why is there a factual question as to whether the lawyer should have looked at the policy? You know, why is there any issue? I mean, wouldn't a reasonably competent lawyer have done that? Is that a factual question? The lawyer has as a starting point, he's looking at a form that says, if you make a comeback, you repay $6 million. He said in his declaration, I'm not an insurance specialist, et cetera. There is nothing in this record that says that a light bulb should have gone off in his head, that this was improper to begin with. That Standard rewrote the policy with Barard when it sent the release form. So there's nothing cited that you can impute from the lawyer to Barard. And there's nothing in the record that suggests that the attorney, as a matter of law, had to look behind the starting point. And let me— New York does take the position that where both parties have available the means of ascertaining the truth, reliance on the statement alleged to be fraudulent is not reasonable. Isn't that this case? Both parties had the policy. No, Your Honor. One of the things that's wrong here is that Brian Barard's case got dismissed when there's absolutely no factually similar precedent for doing so. And it was dismissed on reasonable reliance that's supposed to be fact-intensive. Ignoring that he's 23, high school-only educated— I'm not focusing on what I asked you. New York says that when both parties have access to the materials— Now, your whole argument is that the things they had him sign were fraudulent because the policy did not obligate him to make repayment. Well, both parties had access to the policy. And so to that extent, your client cannot reasonably have relied on these new documents for what his policy obligations were or were not, right? Respectfully, no, Your Honor. All you have to do is look at half of the appellee's brief. It's devoted to arguing that Brian Barard actually did have the repayment obligation that the lower court ruled he should have known that he didn't have. It's not that straightforward an issue. It's not like somebody sent him a release form for $4 million and he knows it's six. There is language in the policy that refers to never being able to return to your occupation, and that's why I feel there's even no explanation in the lower court decision as to what language exactly is it that's supposed to tell a layperson that he doesn't have this repayment obligation. Nothing—he didn't have—and, Your Honor, to your point, the standard is not simply you have access, I have access, you're out of court. That's not the standard. The standard has to be also that there's some reason why you would use that access. It's not a bright line test. This court, as a matter of fact, stated in footnote number nine in Lazard-Ferez that the standard cannot be read so that one party has the information completely unavailable, and that is explicit in the standard. It says we cannot—I'll just quote it, referring to a statement in Grumman— cannot be viewed as establishing that under New York law the information had to be available only to the defendant and absolutely unknowable by the plaintiff before reliance can be deemed justified. And there are numerous cases where there's access to the information, there's access to the information, but there's no notice, there's no suspicious circumstances, no suspicion. Thank you. We'll hear from your adversary. Okay. Thank you. May it please the court? My name is Grant Ingram, representing Standard Security Life Insurance Company of New York. I'd like to just briefly address and clarify one issue, which I believe Your Honor touched upon, which was that the fraud alleged here is quite simple. It is the idea, as we understand it, that the policy did not contain or express repayment obligation and that the allegation is that Mr. Berard was led to believe that it did. But that's the crux of his fraud claim. Yes. And so for purposes of the argument, we accept his construction here. I understand you think that if you had to defend this, you would be able to argue that the documents speak differently. Correct. I also want to quickly point out that there seemed to be a representation that the NHL and the NHLPA policies had an express repayment obligation in them, and that is not accurate. They did not. So the repayment obligation arises under those policies or in the collective bargaining agreement. So they're not in the NHL or NHLPA policies either, just like this private policy. Could you address what consideration there was for the release? It does look like a new term, requiring repayment, was appended without any discussion about how the insurer was compromising his claims or accepting that this was a permanent total disability for certain purposes and foregoing any further investigation or what have you. It just seems like it's just tacked on. Yes. Could you explain? Thank you, Your Honor. And I point you to the declaration of Ashley Lawrence, which is in the record at 149 to 151. He was the representative of the insurer that made the final recommendation to settle this claim. And the evidence from his testimony is that at the time, and the evidence in the record is that Mr. Berard's disability, the permanency of it, was an open issue. The record reflects that throughout the fall of 2000 and into the early 2001, Mr. Berard was making every effort to return. He was on the ice playing. The record also reflects doctors saying he's doing surprisingly well. And even the doctor, Dr. Chang, who eventually gave some words to the effect that he could not play again, just in January, Dr. Chang said at this point he can be reconditioned to skate. I understand that that testimony may explain why, from the insurer's point of view, writing this, the release in this way was a good idea, but was that bargained over? There was consideration in the sense that the insurer would not have, if he did not sign that, Mr. Berard, excuse me, if he did not sign that agreement, the insurer would not have immediately paid the benefits. They had not reached a determination that he was permanently totally disabled. Was there discussion about the repayment obligation at the time they were negotiating this? In the record, there is evidence of a discussion between Mr. Berard's agent, excuse me, his broker, Roger Dolbeck, asking representatives of Standard about the repayment obligation. That's all the record reflects. That indicates that Mr. Dolbeck, his broker, knew about the obligation and that it was discussed. I don't see anywhere else in the claim file that talks about- And is it in the affidavit that you just described that shows that from the insurer's point of view, they could have contested the issue of permanency, but they did not in light of the repayment of provision? That's correct. The policy allows for the insurer to have an independent medical examination, and if that independent medical examiner determined Mr. Berard to not satisfy the definition of total permanent disability, then the policy then would be required to-excuse me, the controversy would be required to submit to arbitration, and an arbitrator would then decide which doctor he or she believed. There was also the opportunity to conduct an examination under oath of Mr. Berard that was waived when the insurer decided to settle the claim on the basis of his representation that he was permanently and totally disabled, and that is no small concession. But that also was not memorialized in the release agreement, though, right? Correct. Correct. So, in fact, you could have gone forward if you had chosen to. Can you- I'm saying that there was-was there any document preventing you, or a commitment that you made preventing you from going forward, and if a question was raised then thereafter deposing Mr. Berard as to the extent of his disability? I mean, again, I'm thinking about what the insurer's internal operations were, but the nature of the discussions and, therefore, the consideration that underlay the agreement isn't so clear, I think. Yes. Well, as Mr. Lawrence says, the repayment obligation is a standard provision when these-in these kind of permanent total disability claims. In the case of an eye injury, which was significant for Mr. Berard, there's still-for example, there was a gentleman named Willie O'Ree who counseled Mr. Berard. There's evidence in the file-the record of that. He played his whole career blind in one eye. So the issue of the permanency was an open issue, and the insurers in these sports policies know that the athletes want to come back. That's how they define themselves. They want to do whatever possible to return if they can. And so-but the policy only pays in the event of permanent total disability. So to address your question, Your Honor, they-this was a concession to settle the claim at this point with the understanding in his representation that he would not return to play again, that he was permanently totally disabled as defined by the policy. Okay. Well, I would just like to then, in my remaining time if I could, summarize again the position. Let me ask a further question then. Your opponent argues that it's important for us in looking at this dispute to take into account Mr. Berard's lack of sophistication in signing off on the release and that the three releases came around the same time and so on. And I wonder if-I mean, you seem to argue that they both had access to the policies and could read the policies and so on, but insurance policies can be very complicated and difficult to understand for the ordinary person. Do you believe that it's never appropriate for a court to take into account in looking at the kind of notice and relative merits of an argument the relative sophistication of the parties? I agree that the consideration of the sophistication of the parties is-can be relevant. But when we're in this case, under these facts, where there's evidence that Mr. Berard was represented by a sports agent and that his agent was aware of a repayment obligation and he was represented by a broker who helped him purchase the policy and was clearly involved to some extent with the-through the claim process, and particularly given that after the repayment or the release agreement was signed, he then retained a lawyer to negotiate on his behalf the repayment agreement, which incorporated by reference the release agreement. Whether or not Mr. Berard himself was sufficiently sophisticated, it's clear he had agents that were sufficiently sophisticated and that represented him and that their sophistication is imputed to him. So in assessing reliance, we can look at those facts, you believe? Correct. Is that right? Okay. Thank you. You're welcome. Mr. Jordan, you did reserve two minutes. Yes. Your Honors, first of all, the statement by Mr. Lawrence, we wouldn't have paid if he hadn't signed this. This is completely and utterly refuted by their own documents. They sent him a letter that said, our medical consultant has finalized his determination that your- I mean, why would an insurance company pay $6 million for a permanent disability and then take the risk that it really wasn't permanent? I mean, it's hardly surprising that they would want some kind of remedy in case it turned out not to be permanent. Well, they could have put that in their policy, and they didn't. They knew how to write a repayment provision in the policy. They could have contested whether it was permanent, correct? That raises a question of fact. He would have fought it and won. They could have contested the permanency. They could have, and that would have- And rather than contest it and drag it out, they agreed to pay the money with an understanding that if it turned out to be wrong, that he would pay the money back. It seems unremarkable to me. They never told him that, and that's why it was improper. Let me point out that on this issue of whether because he had the policy, this is dispositive, let me point the court to what's in our reply brief, the cases of Hay and Amex, which together, Amex is from this court, citing Hay, New York Court of Appeals, and it says where an insurer changes the terms of an insurance policy without notice to the insured for its own benefit. That's what Amex says. It's got to be for its own benefit. That gives rise to a fraud claim that was specifically, by the Court of Appeals, not defeated because the policyholder never read the policy and not defeated by latches. And that points to one of the factors that has to be considered here is the relationship. You have a trusted insurer and a trusting hockey player who knows that insurer is somehow affiliated with his hockey league. He's got no reason to think there's been nothing controversial in this claim. They didn't say, boo, oh, we don't think you're disabled. This looked like a routine claims process. They send it to him while he's recovering from eye surgeries at home with his parents. They don't copy the broker, and they say, if you want your money, sign these forms. And he has no hint, no hint, that these forms don't match his preexisting rights. And as a matter of law, under Hay, Court of Appeals, as recognized by Amex, Second Circuit, the fact that he didn't look at his policy does not defeat the claim for fraud that rises when an insurer changes policies and doesn't do what Your Honor just suggested, that they were in fact doing, which is, oh, well, rather than complete our investigation, we'll do this. They did complete their investigation. Your Honor, I submit that's why they did this. They knew if they told Berard, we're not paying you, he would take them to arbitration and win. Thank you, Mr. Jordan. Thank you. We're going to take the case under advisement.